USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/27/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                           :

WATER QUALITY INSURANCE SYNDICATE,   :
                                                        :                 19 Civ. 6344 (PAE)
                                           Plaintiff,      :
                                                        :                 <u>OPINION & ORDER</u>
                                        -v-                              :
                                                        :
NATIONAL POLLUTION FUNDS CENTER and   :
UNITED STATES OF AMERICA,                         :
                                                        :
                                                   Defendants.   :

------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       At issue in this case is a debt for $57,243.39 that the United States seeks to impose on Genesis Marine, LLC ("Genesis"), for Coast Guard response costs the United States incurred under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, in connection with the lightering of two of Genesis's oil-carrying barges after they ran aground in the Mississippi River in early April 2014. This incident was the subject of a separate action that this Court, following a January 2018 bench trial, resolved in a lengthy written decision issued in April 2018. The Court there resolved a dispute between two of Genesis's insurers, Water Quality Insurance Syndicate ("WQIS") and Starr Indemnity and Liability Co. ("Starr"), regarding their respective responsibility for the far more substantial salvage costs incurred by Genesis in connection with that incident. *See Starr Indem. & Liab. Co. v. Water Quality Ins. Syndicate*, 320 F. Supp. 3d 549 (S.D.N.Y. 2018) ("*Starr*"), *aff'd*, 775 F. App'x 4 (2d Cir. 2019).

       In this action, WQIS, Genesis's pollution liability insurer—standing in Genesis's shoes—claims that the United States and its National Pollution Funds Center (together, the "NPFC") wrongly seek to impose the $57,243.39 debt ("the debt") on Genesis. WQIS emphasizes that the

NPFC's legal theory for claiming such a debt under the OPA—that the stranded barges posed "a substantial threat of discharge of oil"—was rejected by this Court in *Starr* as factually baseless, after a thorough review of witness testimony and extensive documentary evidence regarding the lightering of the barges. And, WQIS notes, the Court in *Starr* expressly rejected the written testimony of a Coast Guard representative who had claimed that the barges posed such a threat, and on whose identical claim the NPFC relies in seeking to impose the debt on WQIS. WQIS asserts that the NPFC, in imposing the debt, failed adequately to consider this Court's decision—or the decision's summary affirmance, in which the Second Circuit expressly affirmed this Court's finding on that point—was arbitrary and capricious, and otherwise violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. WQIS seeks declaratory relief.

The NPFC now moves to dismiss, on two grounds: that venue is improper in this District for an action challenging its imposition of the debt; and that WQIS's complaint fails to state a claim.

For the reasons that follow, the Court dismisses WQIS's lawsuit, solely for lack of venue.

I.  Background[1]

   A.  The Starr v. WQIS Lawsuit

Between January 5 and 9, 2018, this Court held a bench trial in a lawsuit brought by one of Genesis's maritime insurers, Starr, against another, WQIS, concerning responsibility for costs

---

[1] This account is drawn from this Court's prior decision in the litigation between WQIS and Starr, *see Starr*, 320 F. Supp. at 549; WQIS's amended complaint, Dkt. 25 ("FAC"); and its attached exhibits, Dkts. 25-1–12. *See Concesionaria DHM, SA v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004) ("[I]n deciding a motion to dismiss for improper venue, the court may examine facts outside the complaint to determine whether venue is proper." (internal quotation marks and citation omitted)). For the purposes of resolving a motion to dismiss under Rule 12(b)(3), the Court accepts all factual allegations in the FAC as true, drawing all reasonable inferences in plaintiff's favor. *See Cent. Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff"*, 204 F. Supp. 2d 675, 677 (S.D.N.Y. 2002).

incurred arising out of the grounding and ensuing salvage of two oil barges (the GM-5001 and the GM-5002) in the Mississippi River in April 2014. *See Starr*, 320 F. Supp. 3d at 552–53. Starr had reimbursed Genesis for its salvage costs and was assigned the right to sue on Genesis's behalf. *Id.* at 552. Starr then sued WQIS in this Court, for declining to reimburse Genesis for approximately $2.8 million in salvage costs. *Id.*; *see also id.* at 571. Starr claimed that WQIS was responsible for covering these costs under several provisions of a policy under which WQIS had insured Genesis for costs incurred as the result of oil spills and incidents giving rise to a "substantial threat" of an oil spill. *Id.* at 552. Although the grounding of Genesis's barges undisputedly had not caused any spill, Starr claimed that the barges' grounding had presented a substantial threat of a discharge, so as to trigger the WQIS policy. *Id.* at 552–53. WQIS disputed that. *Id.* at 553.

At trial, the Court heard extensive evidence. This included live testimony from five witnesses—three fact and two expert witnesses (one from each side). *See id.* The Court also received written testimony from several witnesses, and excerpts from deposition testimony of others. *See id.* The Court also received extensive exhibits, including detailed records and time logs recounting the protracted salvage efforts. *See id.* The parties also jointly stipulated to various undisputed facts. *See id.*

Salient here, the Court received written testimony of U.S. Coast Guard Chief Petty Officer Heather Norman, in the form of a sworn declaration, PX-22 in *Starr* ("Norman Decl."). *See Starr*, 320 F. Supp. 3d at 553. Norman had been designated as the Coast Guard's on-scene officer with respect to the salvage efforts, although she had been present for only one day of these efforts. *Id.* at 561. The Coast Guard, pursuant to its *Tuohy* regulations, had declined to make Norman available for either deposition or live testimony. *Id.* at 563. The Court

3

nevertheless agreed, over WQIS's objection, to receive Norman's written declaration. *See id*. at 553 n.1.

In a 46-page written decision, the Court held, unequivocally, that the barges did not pose a substantial threat of discharge; that the salvage efforts with respect to the barges had not been undertaken for the purpose of mitigating such a discharge but instead had been undertaken to free the grounded barges; and that, had Genesis not undertaken the salvage efforts it did, the Coast Guard would not have ordered Genesis to do so. *See id.* at 553. The Court therefore held that none of the provisions of WQIS's insurance policy were triggered, and that this policy, therefore, did not cover the costs Genesis incurred. *Id.*

In so ruling, the Court drew extensively on the above evidence. The Court chronicled the sequential plans for lightering the two barges, drawing on contemporaneous records, including the daily reports of the salvor, T&T Salvage LLC ("T&T"). *See id*. at 556–60. The Court also reviewed in detail the actions of the Coast Guard with respect to the incident. *See id*. at 560–65. In finding that the barges did not pose a substantial risk of discharge, the Court found particularly influential the analysis of WQIS's expert, George Randall; T&T's daily reports of the salvage; T&T's conduct of the lightering options; and the Coast Guard's conduct. *See id*. at 570–78. As to the latter, the Court held that, notwithstanding the later claim in Officer Norman's declaration that the barges had presented such a risk, the Coast Guard's words and deeds "did not bespeak a real-time assessment of a substantial threat of discharge." *Id*. at 574.

The Court accordingly held that WQIS was not liable for the salvage costs incurred by Genesis under any of the policy provisions at issue, and thus was not liable to Starr, and entered judgment for WQIS. *See id.* at 578.

In a summary order issued on May 29, 2019, the Second Circuit affirmed. *See Starr*, 775 F. App'x at 8. The Circuit found no error in this Court's conclusions that the barges had not presented a substantial risk of discharge. *See id.* at 7–8. Rejecting Starr's principal claim on appeal, the Circuit further found no error in this Court's finding that the Coast Guard had never determined that the barges posed a substantial risk of discharge. *See id.* at 6–7.

### B. The Coast Guard's Demand for Payment

On January 25, 2018, following the close of evidence at trial but before the Court's written decision had issued, the NPFC wrote to WQIS, stating that the Coast Guard had determined that the barges in fact had posed, under the OPA, a substantial risk of discharge. *See* FAC ¶ 21. It requested payment by WQIS of an NPFC invoice in the amount of $57,243.39, reflecting costs incurred by the Coast Guard in connection with the salvage efforts undertaken in response, allegedly, to that risk. *See id.*; *see also id.*, Ex. C (NPFC letter and invoice).

On May 2, 2018, WQIS responded to the NPFC, alerting the NPFC to this Court's April 25, 2018 decision. *Id.* ¶ 22. WQIS asked that the NPFC withdraw its demand for recovery of the alleged response costs. *Id.*, Ex. D. The NPFC thereafter opened an "administrative review" of WQIS's alleged debt, in the course of which WQIS submitted its arguments and evidence. *See id.* ¶¶ 23–24; *see also id.*, Exs. E–F. This evidence consisted of this Court's decision and a substantial subset of the evidence adduced at trial. *See id.*, Ex. F Appendix A.

In a letter dated April 15, 2019, the NPFC's review officer, Mark L. McEwen, issued his determination. *See id.* ¶ 26. He found, drawing on Officer Norman's written declaration to this effect, that the barges had posed a substantial risk of discharge, and therefore determined that WQIS's disputed debt of $57,243.39 was valid and owing. *See id.*; *see also id.*, Ex. G.

5

On May 30, 2019, WQIS informed McEwen of the Second Circuit's affirmance of this Court's decision, including its specific affirmance of this Court's assessment that, in real time, the Coast Guard had not found a substantial risk of discharge. *Id.* ¶ 27; *see also id.*, Ex. H.

The NPFC, however, declined to reopen the administrative review of the disputed debt to consider the Second Circuit's summary order. *Id.* ¶ 28. It sent a letter, dated June 14, 2019, to WQIS, notifying WQIS that it had referred the debt to the U.S. Department of the Treasury, Bureau of Fiscal Service, for immediate collection. *See id.* ¶¶ 28, 30; *see also id.*, Ex. I. A notice to WQIS, dated June 12, 2019, from that Bureau stated that, in the event WQIS failed timely to pay this debt, WQIS would further incur interest and penalties. *Id.* ¶ 30; *see also id.*, Ex. J.

### C. This Action

On July 9, 2019, WQIS brought this action against the NPFC and the United States. Dkt. 3 ("Compl."). Its Complaint sought declaratory relief to determine its rights and liabilities with respect to the NPFC's determination that its January 25, 2018 invoice for $57,243.39 was due and owing. *Id.* ¶ 6. WQIS claimed that the NPFC's determination to this effect had been unlawful, arbitrary and capricious, and an abuse of discretion, insofar as it did not take into account this Court's and the Second Circuit's decisions in *Starr*, and that the NPFC's efforts to pursue this alleged debt were time-barred. *Id.* at 8–9.

On November 15, 2019, after the NPFC had filed a motion to dismiss, Dkt. 22, WQIS filed an Amended Complaint, making modest adjustments to its allegations, but seeking the same relief. FAC. On December 9, 2019, the NPFC moved again to dismiss, Dkt. 26, filing a memorandum of law in support, Dkt. 27 ("Gov't Mem."). On December 23, 2019, WQIS filed a memorandum of law in opposition. Dkt. 28 ("Pl. Mem."). On December 30, 2019, the NPFC filed a reply. Dkt. 30 ("Gov't Reply").

## II. Discussion

### A. NPFC's Challenge to Venue

The NPFC principally moves to dismiss—or alternatively to transfer this action—on the grounds that venue is lacking in this District for WQIS's APA challenge to the disputed debt. *See* Gov't Mem. at 3–7; Gov't Reply at 1–6. The NPFC is correct on this point.

Federal Rule of Civil Procedure 12(b)(3) provides that a defendant may move to dismiss for improper venue. Fed. R. Civ. P. 12(b)(3). In ruling on a motion to dismiss pursuant to Rule 12(b)(3), the Court accepts as true all factual allegations in the non-moving party's pleadings and draws all reasonable inferences in that party's favor. *See Blakely v. Lew*, No. 13 Civ. 2140 (JMF), 2013 WL 6847102, at *1 (S.D.N.Y. Dec. 30, 2013). Under Rule 12(b)(3), as under Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction, the Court may consider materials outside the pleadings. *Concesionaria*, 307 F. Supp. 2d at 555; *see also Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). Once venue is challenged, the plaintiff has the burden to establish that venue is proper. *French Transit, Ltd. v. Modern Coupon Sys., Inc.*, 858 F. Supp. 22, 25 (S.D.N.Y. 1994). Under 28 U.S.C. § 1406(a), if a case is filed in an improper venue, the Court "shall dismiss, or if it be in the interests of justice, transfer the case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

At the outset, the Court notes that the venue inquiry here is distinct from that in *Starr*. *Starr* involved a dispute between two private insurers, Starr and WQIS, of a common insured, Genesis, over whether the pollution-liability coverage that WQIS provided was implicated by the lightering of the barges, so as to relieve Starr of the obligation it otherwise had for covering the salvage costs incurred by Genesis. *See Starr*, 320 F. Supp. 3d at 552–53. The Court held that it had admiralty jurisdiction over both of these maritime contracts. *See id.* at 567–68. Insofar as

both maritime insurers, Starr and WQIS, had principal places of business in New York, *see id*. at 553, venue in this District was clearly proper under 28 U.S.C. § 1391, and neither party argued to the contrary.

At issue in this case, by contrast, is a debt that the NPFC seeks to impose under the OPA. Building on the Clean Water Act, the OPA creates "a single Federal law providing cleanup authority, penalties, and liability for oil pollution." *In re Deepwater Horizon*, 745 F.3d 157, 168 (5th Cir. 2014) (citation omitted). "The OPA prescribes a supplemental, comprehensive federal plan for handling oil spill responses, allocating responsibility among participants and prescribing reimbursement for cleanup costs and injuries to third parties." *Id.* Relevant here, the OPA creates the Oil Spill Liability Trust Fund, which is available to pay oil-spill removal costs incurred by federal authorities. 33 U.S.C. § 2712(a)(1)(A). Under the OPA, "[t]he NPFC is responsible for adjudicating claims to the Fund and determining whether the uncompensated removal costs are consistent with" the Act's allocation of responsibility for such costs. *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 49 (D.C. Cir. 2016). One such determination is whether the federal government responded to a discharge or substantial threat of a discharge of oil from a vessel. If so, the entity responsible for the vessel must pay the Government for its removal costs and is strictly liable for doing so. *See* 33 U.S.C. § 2702(a)–(b)(1)(A).

Under the OPA, if the responsible party fails to pay the NPFC for response costs, the NPFC may refer unpaid debts to the Department of Justice for civil enforcement or to the Treasury Department for debt collection, *id.* § 3711(g)(1). The latter occurred here. The Coast Guard asserted that it had incurred the $57,243.39 responding to the grounding of the barges, and, asserting that there had been a substantial risk of discharge of oil from the barges, sought to

recoup these costs from the responsible party, Genesis, and its guarantor, WQIS. *See* FAC ¶ 21. As reviewed above, after WQIS challenged this debt, the NPFC undertook an administrative review, adhered to its initial determination, and eventually referred the unpaid debt to the Treasury Department for debt collection. *See id.* ¶¶ 22–30.

Under these circumstances, the OPA's venue provision, 33 U.S.C. § 2717(b), applies. It states, in pertinent part: "Venue shall lie in any district in which the discharge or injury or damages occurred, or in which the defendant resides, may be found, has its principal office, or has appointed an agent for service of process. For the purposes of this section, the Fund shall reside in the District of Columbia." 33 U.S.C. § 2717(b).

Applied here, this provision limits venue to either (1) the Eastern District of Missouri, the site of the salvage operations, because such is where "the injury or damages occurred"; or (2) the District of Columbia, because such, under § 2717(b), is the sole residence of the NPFC. Section 2717(b) does not supply any charter for venue in the Southern District of New York. It does not, for example, provide for venue based on the residence of the party challenging a debt pursued by the NPFC. And it does not provide a basis for venue based on the site of the earlier litigation in *Starr*, among private insurers, arising out of the same salvage operations.

WQIS's counterarguments are quickly put to one side.

WQIS principally relies on the general venue provisions of the APA, 5 U.S.C. § 703, and of 28 U.S.C. § 1391(e). *See* Pl. Mem. at 6–8; *see also* FAC ¶ 4. But such general provisions do not supplant a specific venue provision such as that provided in the OPA. Although specific venue provisions may at times supplement, as opposed to supplant, general venue statutes, that is true only where there is no evidence of congressional intent to the contrary. *See KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 725 (7th Cir. 2013) (citing *Pure Oil v. Suarez*, 384

U.S. 202, 204–05 (1966)); *see also Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). Here, the mandatory text of OPA's venue provision—that "[v]enue *shall* lie," 33 U.S.C. § 2717(b) (emphasis added)—indicates Congress's intent that § 2717(b) serve as the exclusive source of venue for OPA claims. *Cf. Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 562 n.1, 565–66 (1942) (venue provision that "[i]n suits brought for the infringement of letters patent the district courts of the United States *shall* have jurisdiction" in specific circumstances "alone should control venue in patent infringement proceedings" because Congress adopted that provision to define jurisdiction and eliminate uncertainty regarding those claims (emphasis added)). In addition, the OPA's restriction of venue to specific districts—*i.e.*, where the discharge occurred or where the defendant is—evidences a "congressional intent to limit the available districts [that] is clear and cannot be circumvented." *Norkol/Fibercore, Inc. v. Gubb*, 279 F. Supp. 2d 993, 999 (E.D. Wis. 2003). Allowing the general venue provisions of the APA and of § 1391 to govern here would nullify Congress's specific intent evidenced in the OPA.

Specifically, as to the APA, the Supreme Court has found that "[w]hen Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Accordingly, the specific nature of the OPA's venue provision trumps the APA's general venue provision. *Cf., e.g., Sykes v. Duda*, 573 F. Supp. 2d 191, 204 (D.D.C. 2008) (APA claim would not survive because governing statute for Patent and Trademark Office governed venue); *Nat'l Educ. Training Grp., Inc. v. Resolution Tr. Corp.*, 794 F. Supp. 838, 840

10

(N.D. Ill. 1992) (APA claim did not survive because National Bank Act of 1964 governed venue). As to § 1391, the Supreme Court has similarly stated that "Section 1391 governs 'venue generally,' that is, in cases where a more specific venue provision does not apply." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 55 n.2 (2013) (citing 28 U.S.C. § 1400, governing venue for copyright and patent suits); *see also* 28 U.S.C. § 1391(a) (governs venue "[e]xcept as otherwise provided by law"). Because the OPA's specific venue provision applies here, § 1391 does not control. *Cf., e.g.*, *Avalon Holdings Corp. v. Gentile*, No. 18 Civ. 7291 (VSB), 2019 WL 4640206, at *3 (S.D.N.Y. Sept. 24, 2019) (venue provision for Exchange Act in 15 U.S.C. § 78aa governed, not § 1391); *Sygall v. Pitsicalis*, No. 18 Civ. 2730 (VSB), 2018 WL 5981994, at *2 (S.D.N.Y. Nov. 14, 2018) (same for venue provision for copyright infringement in 28 U.S.C. § 1400(a)); *Nix El v. IRS*, 233 F. Supp. 3d 65, 68 (D.D.C. 2017) (same for venue provision for tax refunds in 28 U.S.C. § 1402); *NLRB v. Line*, 50 F.3d 311, 314 (5th Cir. 1995) (same for venue provision for NLRB enforcement actions in 29 U.S.C. § 161); *Templeton v. Veterans Admin.*, 540 F. Supp. 695, 696–97 (S.D.N.Y. 1982) (same for venue provision for Title VII in 42 U.S.C. § 2000e-5(f)(3)).

WQIS next argues that it is not seeking damages from the NPFC. *See* Pl. Mem. at 7. But the OPA's venue provision applies to "all controversies arising under this Act." 33 U.S.C. § 2717(b). WQIS's bid for declaratory relief, in the form of a declaration that it does not owe removal costs to the NPFC, is such an action.

WQIS next notes that the NPFC has pursued recovery of the Coast Guard's removal costs from it, as a guarantor of Genesis, under § 2716(f)(1),[2] and that it is found in this District. *See*

---

[2] A claim for liability for removal costs may be asserted directly against the guarantor of a responsible party, such as WQIS. *See* 33 U.S.C. § 2716(f)(1). WQIS does not contend otherwise.

Pl. Mem. at 7–8. But WQIS's potential substantive liability as a guarantor does not bear on venue in a civil action that *it* has initiated challenging a debt incurred under the OPA. Had WQIS been sued for collection of such a debt, venue where WQIS is found would be proper. But WQIS is the plaintiff here, and, under § 2717(b), venue does not turn on where the plaintiff is found.

Finally, WQIS asserts that the NPFC can be "found" in the Southern District of New York, insofar as the co-defendant United States has assigned the United States Attorney for this District as an agent for the service of process. *See* Pl. Mem. at 8–10. But, while this argument addresses the *United States*, it does nothing to establish venue in litigation arising under the OPA against the *NPFC*, which resides by statute in the District of Columbia. *See* 33 U.S.C. § 2717(b). And the United States' designation of the U.S. Attorney as its agent for the service of process, and its conceded waiver of the right to object on the grounds of insufficient service on it, *see* Gov't Reply at 3 n.1, do not broaden the venues permissible under § 2717(b).

The Court, accordingly, holds that venue in this District is not proper over WQIS's lawsuit challenging the debt that the NPFC seeks to impose on it.

**B.     Remedy**

Under Rule 12(b)(3), a court finding venue improper may either dismiss or, where the interests of justice so require, transfer the case to a District in which venue is proper. *See, e.g.*, *Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993) (citing 28 U.S.C. § 1406(a)). That decision as to remedy "lies within the sound discretion of the district court." *Id.* WQIS has not asked the Court, in the event that venue is found lacking, to transfer the case. Nor has WQIS indicated, in the event the Court were to consider such a transfer, a preference as between the options available under § 2717(b): the Eastern District of Missouri or the District of Columbia.

12

The Court accordingly will dismiss this case, without prejudice to WQIS's right to refile in a District in which venue is proper. However, in the event that WQIS, within one week of this decision, asks the Court, in lieu of dismissal, to transfer this case to either of these Districts, the Court will re-open this case for the limited purpose of changing the disposition from a dismissal without prejudice to a transfer to such District.

In light of the above ruling, the Court does not have occasion to resolve the NPFC's alternative argument, that WQIS's Amended Complaint fails to state a claim.

The Court must, however, encourage responsible attorneys for the Government to assess *de novo* whether it is factually justifiable—and consistent with the Government's high standards of conduct—to continue to pursue the debt against WQIS, based, as this debt is, on the discredited theory that the grounded barges posed a substantial risk of discharge. As reviewed above, in the *Starr* litigation involving the same issue, this Court exhaustively considered that issue, in light of a vast volume of evidence presented at trial, and, applying this same OPA standard, firmly concluded that the barges did not pose such a risk. The Second Circuit affirmed. In that trial, the Coast Guard elected not to expose its witness, Officer Norman, to live testimony, submitting instead her declaration attesting to the existence of such a risk. This Court decisively rejected her claim to that effect as unsubstantiated and contradicted by the assembled evidence. Under these circumstances, counsel and other relevant officers of the Government should carefully consider whether it is responsible—or honorable—for the NPFC to pursue a debt from WQIS premised on the same discredited declaration, which the Coast Guard has not permitted to be exposed to adversarial examination.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss the Amended Complaint, based on improper venue. The dismissal is without prejudice to WQIS's right to file this action in a District in which venue is proper.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 22 and 26 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 27, 2020
New York, New York